In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3480

Local 75, International Brotherhood of Teamsters,
Chauffeurs, Warehousemen & Helpers,

Plaintiff-Appellee,

v.

Schreiber Foods, Inc.,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98 C 1151--Myron L. Gordon, Judge.

Argued February 16, 2000--Decided May 22, 2000


   Before Kanne, Diane P. Wood and Evans, Circuit
Judges.

   Kanne, Circuit Judge.  The question in this case
is whether Schreiber Foods, Inc. ("Schreiber")
must arbitrate the grievance of its employees'
union, Local 75 of the International Brotherhood
of Teamsters ("Teamsters"), pursuant to the
arbitration clause of their collective bargaining
agreement. Although grievances arising under the
agreement are arbitrable, Schreiber insists this
grievance over scheduling is nonarbitrable
because the agreement gives Schreiber absolute
discretion over "administration" of certain
programs and exempts questions of
"administration" from the arbitration clause.
However, we find that scheduling is not covered
by the administration clause or exempted from
arbitration because Schreiber's discretion over
scheduling is restricted by a different provision
of the agreement limiting scheduling to
"reasonable times and frequencies." We affirm
summary judgment in favor of the Teamsters.

I.  History

   During the summer of 1992, Schreiber and the
Teamsters were in the midst of negotiations for
a new collective bargaining agreement to begin
the following year. Schreiber proposed a series
of "Pay for Performance" programs ("PP programs")
in which Schreiber employees could earn
compensation above their regular wage by
participating in a variety of work safety

activities. On September 28, 1992, while still negotiating their collective bargaining agreement, the parties codified their agreement on PP programs in a "Memorandum of Agreement of Pay for Performance" ("Memorandum"). Exhibit B-1 of the Memorandum described one PP program, called the "Safe Work Program," which Schreiber instituted on October 4, 1992.

The Memorandum also delineated basic guidelines for the establishment and administration of PP programs. Paragraph 5 of the Memorandum declares the following:

The administration (for example, including but not limited to, the content of any program, training, questions asked on any exam, grading of the exam, etc.) of the Pay for Performance program is in the exclusive discretion of the Company and it will not be subject to arbitration.

However, Paragraph 2 of the Memorandum adds the following stipulation:

The Company agrees to establish a training schedule at reasonable times and frequencies to afford employees who desire to participate in the Company's pay for performance programs the opportunity to successfully complete such program before the anniversary date of the agreement as set forth in the parties's collective bargaining agreement. Should the Company fail to provide this opportunity, the employee will be provided the benefits of such program until the employee has been provided such opportunity.

In addition, Paragraph 3 of the Memorandum states that "[t]he Company will post training schedules no less than four (4) months prior to any pay for performance effective date to assure adequate training time." The parties eventually reached agreement on a new collective bargaining agreement ("CBA") that incorporated the Memorandum and ran to September 27, 1997. Later, the parties would effectively extend the relevant terms of the CBA to September 29, 2002.

On April 23, 1993, as part of the Safe Work Program discussed in the Memorandum, Schreiber instituted a pre-workday exercise program that trained employees how to perform various exercises designed to prevent carpal tunnel syndrome. Schreiber permitted employees to perform their exercises during the fifteen minutes before their regular shifts and paid them overtime for the extra quarter-hour of work. The Memorandum does not refer specifically to a carpal tunnel syndrome prevention program, but Exhibit B-1 of the Memorandum briefly alludes to

carpal tunnel syndrome prevention, stating that "in the event an employee is diagnosed with Carpal Tunnel Syndrome, the employee will not lose Safe Work pay, provided the employee fully participates in Company sponsored Carpal Tunnel prevention programs."

At the beginning of October 1997, Schreiber unilaterally abrogated the pre-workday period for carpal tunnel exercises and instructed employees to perform their exercises during their regular shifts instead. Employees participating in the carpal tunnel syndrome prevention program were therefore no longer able to collect overtime pay for their exercises, and employee participation in the program consequently plummeted from around 50 percent to 31 percent. On October 27, 1997, the Teamsters filed a grievance protesting that Schreiber violated the CBA by eliminating the fifteen-minute overtime period.

The Teamsters anticipated arbitration of the dispute because Article 10 of the CBA provides that "[g]rievances which arise during the term of this Agreement and are filed before the expiration date of the Agreement and have been timely processed through the Grievance Procedure but which have not been settled may be appealed to arbitration" and Article 9 of the CBA defines "grievance" as "a dispute arising under a provision of this Agreement." However, on March 5, 1998, Schreiber responded to the grievance by citing Paragraph 5 of the Memorandum, which states that "[t]he administration . . . of the Pay for Performance Program is in the exclusive discretion of the Company." Schreiber explained that it "[did] not believe there is any binding agreement or practice obligating the Company to continue the '15 minutes of overtime.'" On August 25, 1998, after the Teamsters pressed for arbitration of its complaint, Schreiber answered that it "made the determination that this matter is not arbitrable under our Collective Bargaining Agreement. . . . This rescheduling of a program is part of the administration of the Safe Work Program under the Safe Work Memorandum of Agreement. Paragraph 5 of that Memorandum explicitly states that administration of the Program is not subject to arbitration."

On October 29, 1998, the Teamsters brought suit against Schreiber before the Wisconsin Employment Relations Commission to compel arbitration of the grievance pursuant to Article 10 of the CBA. Schreiber removed the case under 28 U.S.C. sec. 1441(b) to federal district court on November 24, 1998. After cross-motions for summary judgment, the district court granted summary judgment in favor of the Teamsters on September 1, 1999. Schreiber now appeals.

II.  Analysis

The duty to arbitrate is prescribed by contract, and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960). The Teamsters' grievance is that Schreiber violated the Memorandum by changing scheduling for carpal tunnel exercises, and both parties agree that the Memorandum is part of the CBA. Thus, the Teamsters sued to compel arbitration pursuant to Article 10 of the CBA, which provides that disputes arising under the CBA "may be appealed to arbitration" as a matter of right. The district court granted summary judgment in favor of the Teamsters, finding that this dispute must be arbitrated under Article 10.

However, Schreiber contends that Paragraph 5 of the Memorandum, which states that "[t]he administration . . . of the Pay for Performance Program is in the exclusive discretion of the Company and it will not be subject to arbitration," removes the Teamsters' grievance from the ambit of Article 10 of the CBA. Schreiber argues that "administration" in Paragraph 5 covers all the "day-to-day details of running" PP programs, including scheduling changes like the one about which the Teamsters filed its grievance. Paragraph 5 specifies that disputes over such "administration" are "not subject to arbitration," and Schreiber claims that this scheduling change of the carpal tunnel exercise period is nonarbitrable as a result. We review summary judgment de novo. See Oil, Chemical & Atomic Workers Int'l Union, Local 7-1 v. Amoco Oil Co., 883 F.2d 581, 583-84 (7th Cir. 1989).

The problem with Schreiber's contraposition is that Paragraph 2 of the Memorandum limits the scope of Paragraph 5. Paragraph 2 expressly confines Schreiber's authority over scheduling PP program training to "reasonable times and frequencies to afford employees who desire to participate in the Company's pay for performance programs the opportunity to successfully complete such program." When read in conjunction with Paragraph 2, Paragraph 5 cannot be read to vest Schreiber with absolute discretion in scheduling. If Paragraph 5 meant that Schreiber could unilaterally schedule PP program training whenever it desired, Paragraph 2's express restriction on scheduling to "reasonable times and frequencies" would retain no meaning. See Florida Polk County v. Prison Health Servs., Inc., 170 F.3d 1080, 1084 (11th Cir. 1999) (reading a forum-selection clause to be mandatory

because interpreting it to be permissive would render the clause meaningless under the circumstances); United States v. Brye, 146 F.3d 1207, 1211 (10th Cir. 1998) (interpreting ambiguous language in a plea agreement to avoid rendering part of the agreement superfluous); In re Chicago, Rock Island & Pac. R.R. Co., 860 F.2d 267, 271 (7th Cir. 1988) (refusing to interpret an agreement as settling an issue the resolution of which would be dispositive of another dispute that the agreement expressly excluded from settlement).

A more sensible interpretation, giving life to both provisions, is that "administration" includes the management of PP programs, over which Schreiber has exclusive, nonarbitrable discretion, but that training for PP programs must be scheduled in accordance with Paragraph 2 and disputes over such scheduling are arbitrable. Reading the language in Paragraph 5 as broadly as Schreiber urges would render Paragraph 2 purposeless, and "a proposed contractual interpretation that would read out of a contract language obviously important to one of the parties faces and ought to face a distinctly uphill struggle for judicial acceptance." In re Kazmierczak, 24 F.3d 1020, 1022 (7th Cir. 1994). Instead, Paragraph 2 limits Schreiber's discretion in scheduling and removes grievances over scheduling of training from the arbitration exemption in Paragraph 5 for "administration" of PP programs.

Schreiber insists that Paragraph 2 does not apply to this dispute because Paragraph 2 extends only to "training schedule[s]." Schreiber explains that some of the PP programs required formal training during which employees needed to attain certification or pass a qualification test for extra compensation under the respective program. Paragraph 2, according to Schreiber, embraces these training drills but not the carpal tunnel syndrome prevention exercises, which in contrast to formal training, were ongoing exercises without any completion dates. It is difficult to determine whether the carpal tunnel syndrome prevention exercises constituted "training" as contemplated by Paragraph 2 because "training" is not defined in the Memorandum or CBA. The fact that "training" is referenced expressly in Memorandum descriptions of several PP programs, but not in the synopsis of the Safe Work program, is unilluminating because the carpal tunnel syndrome prevention program had not yet been conceived when the parties drafted the Memorandum and therefore is not mentioned as such in the document. In the face of this contractual ambiguity, we apply "a presumption of arbitrability in the sense that '[a]n order to

arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" Local Union 1393 Int'l Bhd. of Elec. Workers v. Utilities Dist. of W. Ind. Rural Elec. Membership Coop., 167 F.3d 1181, 1183 (7th Cir. 1999) (quoting United Steelworkers, 363 U.S. at 582-83). "[O]nly the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." United Steelworkers, 363 U.S. at 585.

We cannot say with "positive assurance" that this grievance is not covered by the arbitration clause in Article 10. It is reasonable to conclude that the carpal tunnel prevention exercises were PP program training because the definition of "training" comfortably encompasses daily exercise aimed at preventive goals such as health maintenance and injury avoidance. Schreiber expected its employees to perform these exercises each day to ward off carpal tunnel syndrome, and even though these exercises had no completion or qualification goals, Schreiber conditioned Safe Work Program bonuses on consistent participation in the carpal tunnel syndrome prevention program. Guided in part by the presumption in favor of arbitrability, we interpret "training" in Paragraph 2 to cover the carpal tunnel exercise program.

Once we establish that Paragraph 2 limits Paragraph 5 and applies to the carpal tunnel exercise program, the rest of this case falls neatly into place. The Teamsters' grievance complains about an alleged violation of Schreiber's promise to schedule PP program training at "reasonable times and frequencies" memorialized in Paragraph 2 of the Memorandum and thereby incorporated into the CBA. Thus, this dispute arises under the CBA within the meaning of "grievance" in Article 9 and is subject to arbitration under Article 10.

The Teamsters, however, possess no implicit right to a carpal tunnel exercise program. An official carpal tunnel syndrome prevention program was not mentioned in either the Memorandum or the rest of the CBA. Indeed, the program did not begin until April 23, 1993, months after the CBA was finalized and ratified. Schreiber never was obligated to institute a carpal tunnel syndrome prevention program, but once it decided to do so, Schreiber was obligated to establish a training schedule for the program "at reasonable times and frequencies" because it had agreed to that stipulation for all PP

programs. Whether Schreiber's decision to terminate the pre-workday period and require employees to perform their exercises during the workday violates that stipulation is the question for arbitration now to resolve.


III.  Conclusion

   For the foregoing reasons, we Affirm the decision of the district court granting the Teamsters' motion for summary judgment.